(35 Misc. Rep. 623.)

EPISCOPO v. MAYOR, ETC., OF CITY OF NEW YORK et al.

(Supreme Court, Special Term, New York County. August, 1901.)

1. MUNICIPAL CONTRACTS—DELAY.

Where it has been the practice of a city in dealing with a contractor to measure up his work monthly, and pay him 70 per cent. of it in the following month, on certificate, under a contract providing for such payments in monthly installments in the discretion of the street commissioner, it cannot delay measuring up the work where the contractor is proceeding according to his contract, and neglect to make the usual monthly payment necessary to enable him to continue the work, and thereupon declare the contract abandoned for the delay caused thereby.

2. SAME—ASSIGNMENT.

Where a contract with a city for a public improvement prohibits assignment of it unless the commissioner of street improvements consents thereto in writing, the clause is for the benefit of the city as against an assignee, and is available only when pleaded by the city.

3. SAME—VALIDITY.

Where a contractor took an assignment of a contract with a city from his former partner, and assigned the reserve payments to a bank as collateral for his note, a clause in the contract prohibiting assignment of it unless the commissioner of street improvements consented thereto was inapplicable where the reserve belonged to the contractor.

4. MECHANICS' LIENS—APPORTIONMENT.

Where a city contractor had assigned the reserve fund payable by the city to him to a bank as collateral, an agreement between other lienors as to the distribution of the surplus after payment to the bank will be enforced.

Action by Henry A. Episcopo against the mayor and council of the city of New York and others to foreclose mechanics' liens. Judgment for plaintiff.

Hawes & Norman, for plaintiff.

John Whalen, Corp. Counsel (Chase Mellen, of counsel), for defendant mayor.

Charles W. Dayton (L. Laffin Kellogg, of counsel), for defendant Twelfth Ward Bank.

J. Woolsey Shepard, for defendant Armbrust.

Otis & Prissinger, for defendant Rand Drill Co.

Douglas Mathewson, for defendant Bellotti.

Charles L. Livingston, for defendant McBride.

Bullowa & Bullowa, for defendant Simoni.

Dutton & Kilsheimer, for defendants Cameron & Morrison.

Joseph P. O'Neill, for defendant Sullivan.

Earley & Prendergast, for defendant Bell.

Lyman L. Settel, for defendants Hudson and others.

Alex. U. Mayer, for defendants Maio and others.

Richard Stackpoole, for defendants Raymond & Co.

George W. Stephens, for defendant Stevens.

R. Hickox, for defendant Vaught.

CHESTER, J.   This is an action brought to foreclose three mechanics' liens filed by the plaintiff, as assignee of a large number of laborers who performed work under a contract made May 25, 1897, between the city of New York and the firm of J. P. Armbrust & Co., for the construction of what is known as the "Williamsbridge Sewer." This firm was composed of James P. Ambrust and Hugh J. Reilly. Notices of these liens were filed in November, 1897. About the same time a number of notices of other liens were filed by parties who had performed work or furnished materials required by the contract upon the sewer in question. These are made parties defendant as well as the contractors, the city of New York, and the Twelfth Ward Bank. On the 13th day of July, 1897, Reilly and Armbrust entered into an agreement dissolving their co-partnership. Under this agreement the sewer contract was assigned to Reilly in consideration of the payment to Armbrust of $1,800 out of the first payments he received from the city on account of the performance of the contract, and the further sum of $5,000 out of the final payments which may be found due upon the completion of the contract. On the 15th day of July, 1897, the Twelfth Ward Bank discounted Reilly's note for $7,000, and took as security an assignment from him of all moneys then due, or thereafter to grow due, to the extent of $7,000, upon the reserve of 30 per cent. provided for in the contract between the city and Armbrust & Co. The $7,000 was paid by the bank to Reilly, who in turn paid $1,800 of it to Armbrust in part payment of the consideration of the contract of dissolution, and the balance of $5,200 was used by Reilly in work upon the sewer. The moneys paid by the city under the contract were received by Reilly, but were receipted for by both contractors. In form, at least, so far as the city was concerned, the work was carried on in the name of the firm, the same as if there had been no dissolution of the co-partnership. Reilly prosecuted the work under the contract until about the 25th day of October, 1897. Soon after that, the commissioner of street improvements of the Twenty-Third and Twenty-Fourth wards, who had charge of this contract on behalf of the city, declared the contract abandoned, and served notices upon the contractors to that effect, and directed them to discontinue all work thereunder. A new contract, aggregating about $6,100 increase in the cost, was thereafter let to another contractor, who completed the sewer. Other facts connected with this somewhat complicated controversy will be mentioned in discussing the legal principles involved.

The first question to be determined is whether or not there are any moneys due and payable from the city, under its contract with Armbrust & Co., for work performed in the construction of the sewer, and, if so, as connected with that question, how much? As related to this, the question is presented whether or not the city lawfully declared the contract abandoned, and lawfully prevented Reilly from completing performance of it. The contract contains the following clause:

"(f) And the said party of the second part further agrees that, if the work under this agreement shall be abandoned, or if at any time the commissioner of street improvements of the Twenty-Third and Twenty-Fourth

wards shall be of the opinion, and shall so certify in writing, that the said work, or any part thereof, is unnecessarily delayed, or that the said contractor is willfully violating any of the conditions or covenants of this contract, or executing the same in bad faith, or if the said work be not fully completed within the time stipulated therefor, he shall have the power to notify the aforesaid contractor, by a written notice, to be served upon the contractor either personally or by leaving said notice at his residence or with his agent in charge of the work, to discontinue all work, or any part thereof, under this contract; and thereupon the said contractor shall discontinue said work, or said part thereof, and the said commissioner shall thereupon have the power to readvertise and relet the work by contract in the manner provided by law, or to work at and to complete the work herein described, or said part thereof, and to charge the expense of such completion to the aforesaid contractor; and the expense so charged shall be deducted and paid by the party of the first part out of such moneys as may be then due or may at any time thereafter grow due to the said contractor under and by virtue of this agreement, or any part thereof; and, in case such expense shall exceed the sum which would have been payable under this contract if the same had been completed by said contractor, he will pay the amount of such excess to the parties of the first part; and, in case such expense shall be less than the sum which would have been payable under this contract if the same had been completed by said contractor, he shall forfeit all claim to the difference."

The claim is made on the part of those having interests adverse to the city that at the time the city assumed to declare the contract abandoned it was itself in default to the contractors because of the nonpayment of the moneys then due to them, and that, until such default was cured, it had no lawful right to declare the contract abandoned, or to interfere with the prosecution of the work under it. It is clear that, if the city failed or refused to make payments when payments were due, it was guilty of such a breach of the contract as would serve to forfeit its rights to give the notice of abandonment which it did, and the rights of the parties became fixed as of the date of such breach. Graf v. Cunningham, 109 N. Y. 369, 16 N. E. 551; Wright v. Reusens, 133 N. Y. 298, 305, 31 N. E. 215; Kingsley v. City of Brooklyn, 78 N. Y. 200. The contract provides "that the return of the engineer shall be the account by which the amount of materials furnished and the work done shall be computed." It also provides that:

"In case the amount payable under this contract shall be $5,000 or over, payments will be made to the said party of the second part * * * by monthly installments of 70 per cent. on the amount of work performed, and also on the quantity of materials furnished and delivered, should the commissioner of street improvements of the Twenty-Third and Twenty-Fourth wards deem it advisable so to do, in which case, however, the quantity returned shall be such that the amount paid will be fairly due, and in accordance with the provisions and stipulations of this agreement: provided, the amount of work done on each installment shall not be less than $1,500."

The moneys payable under this contract largely exceeded the sum of $5,000, and during the progress of the work the amount of work done each month, as appears by the certificates of the engineer, largely exceeded $1,500. It appears that three certificates for 70 per cent. payments, under the foregoing clause, were given by the chief engineer, certified as correct by the commissioner of street improvements, and paid as follows: No. 1, dated July 6, 1897, for $5,634.44, paid July 29, 1897; No. 2, dated August 6, 1897, for $4,495.51, paid

August 30, 1897; No. 3, dated September 7, 1897, for $5,510.65, paid September 25, 1897. It appears from these certificates and the testimony that down to October the course of dealing between the city and the contractors was that the work for the prior month was measured and certified about the 6th or 7th of the following month, and the 70 per cent. payments made during the last week of the month in which the measurements were made. While there was nothing in the contract which fixes the time when the city was to make the 70 per cent. payments, except that they were to be made monthly, and while they were to be made provided the commissioner of street improvements should deem it advisable so to do, yet, after the city and the contractors had acquiesced for months in a course of dealing under the contract fairly within its terms, whereby the latter had received certificates the first week in the month for 70 per cent. of the prior month's work, and had invariably received payment therefor in about 20 to 25 days thereafter, it would, I think, be unreasonable for the city to be permitted, arbitrarily or without just cause, to withhold certificates or payments for a much longer period, thus depriving the contractors of funds which, in the absence of other means, were requisite to their going on with the work. There can be no justice in permitting a contract to be declared abandoned, and the moneys payable thereunder forfeited, because of alleged failure to promptly perform the contract, when the only cause for ceasing work was the failure to promptly pay the contractors moneys due to them from the party so declaring and claiming the forfeit, and which moneys they had the right to have, and which were essential to enable them to hire men and purchase material necessary to the prompt performance of the contract. A fourth 70 per cent. certificate was given, dated October 7, 1897, for $3,234.13, which covered work done and materials furnished subsequent to the giving of the third certificate. The last certificate, as well as the three former ones, each recited that the work and materials mentioned therein had been performed and delivered as required by the contract, and in a satisfactory manner, and that the moneys mentioned therein were justly due. These moneys being due, the contractors were entitled to receive them with reasonable promptness after the issue of the certificate. This certificate No. 4 was forwarded by the commissioner of street improvements to the office of the comptroller, where it remained for some time. While there, a demand was made for its payment upon the comptroller, and also upon the commissioner, but it was not paid. The commissioner recalled the certificate from the comptroller by a letter dated November 6th, and received at the comptroller's office November 10, 1897. By letter dated November 11th, and received at the comptroller's office November 18th, the comptroller was notified by the commissioner that he had declared the contract abandoned. Mr. Reilly testified that he had continued the work down to the month of October, 1897, regularly, without complaint; that he made payments for labor on the 20th of the month, but changed it to the 25th on account of the slowness of payments by the city; that the last payment he received was for the August work, and that he got that about the 25th of September, 1897; that he wrote to the

commissioner between the 5th and 8th of October, 1897, that, if he did not get his money before the 25th of the month, and did not get the measurements, he would have to stop work; that the pay was to be on the 25th of the month, and that he wanted the money to pay off the men for September; that he did not get any reply to that letter, and did not get his pay for the month of September; that he stopped his work on the 25th of October; that the only reason he stopped was that the city had neglected to pay him his money; and that, if he had received his money every month, he would have been able to complete his contract. He also said that the engineer did not come to measure his work for September until the 8th or 10th of October. The city furnishes no evidence in denial of these statements. No sufficient reason has been furnished by the city for its failure to make the payment under the fourth certificate, nor for the failure to make measurements promptly. Nor can I find in the evidence any reasonable justification for the act of the commissioner in declaring the contract abandoned, even though the city was not in default at the time. It was claimed upon the trial, upon behalf of the city, in justification of its course, as appears from the testimony of the chief engineer in the department of street improvements in the Twenty-Third and Twenty-Fourth wards, that he visited the work about September 22, 1897, and that he saw only 8 or 10 men employed on the contract at the time, but he did not go down in the trenches. On the contrary, it appears from the testimony of the plaintiff, who was a superintendent for Reilly upon the work, in which he was corroborated by the original time book kept by him, that on September 22, 1897, there were 83 men, besides 2 teams and teamsters, employed, and about that number for some days thereafter; and that many of these were employed at the bottom of the sewer, where they could not be seen from the surface of the ground, leaving only 8 or 10 men visible above ground. He also said that there were, approximately, 167 to 169 men working there under Reilly in the month of October, 1897, up to the 25th of that month. The city also put in evidence a letter from Reilly, bearing date October 28, 1897, to the commissioner, as follows:

"Your letter regarding our work in Williamsbridge received. We will be prepared to go ahead with the work Monday morning, and will do all in our power to push same. Regretting the delay, and trusting the above will be satisfactory, I am

"Yours respectfully,                    Hugh J. Reilly,
                    "Representing J. P. Armbrust & Co."

In view of the attending circumstances, I cannot see that the admission of delay contained in this letter furnishes a sufficient justification for the city, nor that it is a waiver of the default of the city in making the payment due. It would seem more correct to assume that it was written with the anticipation, on the one hand, that the moneys due might be paid in time to enable work to be resumed at the time stated, and with the fear, on the other hand, that, if work was not resumed, the city might take the course which it afterwards did, and declare the contract abandoned. It seems to me clear from the testimony that the work was not voluntarily abandoned by the

contractors, and was not lawfully or rightly declared abandoned by the city. If I am correct in this conclusion, the question is presented as to how much the city should pay by reason of its interference with the work. It is well settled that, when a breach of contract of payment is made, the contractor is entitled, as damages, to at least the entire amount earned under the contract at that time without further performance. Jones v. City of New York, 47 App. Div. 39, 62 N. Y. Supp. 284; 57 App. Div. 403, 68 N. Y. Supp. 228. On this basis the following is a statement showing the amount earned under the contract at the time, viz.:

| | |
|---|---:|
| Amount earned and certified by first three certificates.......... | $22,343 72 |
| Amount earned and certified by certificate No. 4, which was withdrawn ............................................................... | 4,620 18 |
| To this should be added work done after October 7, 1897, which was measured, but not certified, as appears by the testimony of Engineer Fitch, employed in the department of street improvements. to the value of....................................... | 4,320 49 |
| Total ................................................... | $31,284 39 |
| From this should be deducted the payments made under the first three certificates ........................................... | 15,640 60 |
| Leaving a balance due of............................... | $15,643 79 |

To which should be added interest from the date of the service of notice that the contract was declared abandoned, November 11, 1897.

The next question is the one arising between the Twelfth Ward Bank, the various claimants of liens upon the fund, and the city as to the validity of the assignment to the bank to secure Reilly's note. The assignment antedates the filing of any of the notices of liens, and, being prior in point of time, the bank is entitled to the preference to the extent of the moneys assigned, unless the assignment itself is, for some reason, invalid. Fortunato v. Patten, 147 N. Y. 283, 41 N. E. 572; McKay v. City of New York, 46 App. Div. 584, 62 N. Y. Supp. 58. Those opposed to the claim of the bank invoke the following provision of the contract in support of their theory that the assignment is invalid, viz.:

"(g) And the said party of the second part [the contractors] hereby further agrees that he will give his personal attention constantly to the faithful prosecution of the said work; that he will not assign or sublet the aforesaid work without the previous written consent of the commissioner of street improvements of the Twenty-Third and Twenty-Fourth wards, indorsed on this agreement, but will keep the same under his own control; that he will not assign, by power of attorney or otherwise, any of the moneys payable under this agreement, unless by and with the like consent, to be signified in like manner; that no right under this contract, nor to any moneys to become due hereunder, shall be asserted against the mayor, aldermen, and commonalty of the city of New York, or any department, bureau, officer, or officers thereof, by reason of any so-called assignment, in law or equity, of this contract, or any part hereof, or of any moneys due or to grow due hereunder, unless such assignment shall be authorized by the written consent of the commissioner of street improvements of the Twenty-Third and Twenty-Fourth wards indorsed on this agreement."

Neither the assignment by Armbrust to Reilly of the former's interest in the contract nor the assignment by Reilly to the bank received the written consent of the commissioner, evidenced by his written in-

72 N.Y.S.—10

dorsement to that effect upon the contract. The fact of this omission, if properly pleaded, would undoubtedly serve as a defense to the city to any claim made against it by an assignee of the contract, but here the claim of the bank is not made against the city, but against the 30 per cent. reserve payable under the contract. If these funds do not belong to the city, as has been held, it is a matter of no concern to it what parties are held to be entitled to receive them. More than this, the city has not put itself in a position to avail itself of this clause in the contract, because of its failure to plead it as a defense in its answer. Burke v. City of New York, 7 App. Div. 128, 40 N. Y. Supp. 81. Neither can this clause serve as a defense to the various parties claiming liens, for the reason that its sole purpose is for the protection of the city, and not of outside parties. That lienors cannot avail themselves of such a clause was decided in the case of Fortunato v. Patten, supra. The Twelfth Ward Bank is therefore entitled to be first paid the amount of its note against Reilly for $7,000 and interest out of the 30 per cent. reserve in the hands of the city. The amount earned under the contract being $31,284.39, as above shown, this reserve, without interest, amounts to $9,385.32, which is more than sufficient to pay the claim in full, and which leaves a very considerable surplus applicable to the payment of costs and of other liens and claims.

There remains the question as to the proper disposition of this surplus. In the arguments upon the trial and in the briefs of counsel various alleged defects in the numerous liens claimed by the parties and a multiplicity of defenses to each of the several liens and claims were pressed upon the attention of the court, some of which have much force; but they need not be considered, for since the submission of the case the attorneys for each of the parties who proved their liens or claims upon the trial, other than the bank, have joined in a stipulation agreeing upon a basis of distribution among them of the moneys which the court may find to be applicable to the payment of such liens and claims, and waiving all objections and exceptions to the other liens or claims filed or proved except to the claim of the bank. The stipulation also contains an agreement as to counsel fees. Neither the city nor the bank are parties to the stipulation. I conceive of no reason why force should not be given to the stipulation, except, possibly, that part of it relating to counsel fees. After the bank's claim is paid in full, it can have no further interest in antagonizing the claim of any other party or in the proportion of the fund paid to either of them. Nor can the city have any such interest. If the conclusion that the amount above stated has been earned under the contract, and has not been forfeited, is correct, it matters not to the city what claimants are held to be entitled to the fund. The contractors cannot complain, as the stipulation, except as to counsel fees, agrees to apply the moneys to the liquidation of obligations incurred under the contract. Armbrust's only interest is to save himself from personal liability, and Reilly has not answered. The only objection to the stipulation relating to counsel fees is that the amount agreed upon for counsel to the plaintiff exceeds the amount the court may lawfully grant by way of an allowance of costs. With this exception,

and after the payment of the costs and allowances hereinafter men-- tioned, the surplus may be distributed as provided by the stipulation.

I am unable to gather from the evidence anything upon which a personal liability against the defendant Armbrust can be sustained. The claims of all the parties to this effect against him were withdrawn upon the trial, except on behalf of the plaintiff and of the defendant Raymond; but counsel for neither of these parties has pressed this question in his brief, and I conclude that each has reached the same conclusion in this respect as was announced by the other parties on the trial.

Decision and judgment may be prepared in harmony with this opinion, with costs to the plaintiff, and an extra allowance of $750 in lieu of the amount of counsel fees stated in the stipulation, with costs to the Twelfth Ward Bank and an extra allowance of 5 per cent. on the amount of its claim, with costs to the defendant Armbrust and an extra allowance of $100, and with an allowance by way of costs to the several parties joining in the stipulation, other than the plaintiff, in the amounts therein stated, in lieu of the counsel fees therein agreed upon; all such costs and allowances to be paid out of the fund. Settlement may be had upon the usual notice.

Judgment accordingly.